**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| In re:<br><br>SPD II MAKAIWA RESORT<br>DEVELOPMENT, LLC,<br>            Debtor. | Case No. 23-7153<br>Chapter 11<br>Honorable David D. Cleary |

---

**DISCLOSURE STATEMENT FOR THE PLAN OF LIQUIDATION UNDER
CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

---

**REED SMITH LLP**

Ann E. Pille
Reed Smith LLP
10 S. Wacker Drive, Suite 4000
Chicago, IL 60606
Telephone: (312) 207-1000
Facsimile: (312) 207-6400
E-Mail: apille@reedsmith.com

*Counsel for Plan Proponent Corban Kauai Chicago
Lender, LLC*

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

SECTION 1 INTRODUCTION ................................................................................. 1

SECTION 2 DEFINITIONS ................................................................................... 2

SECTION 3 SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS
AND INTERESTS UNDER PLAN AND IMPORTANT SOLICITATION AND
CONFIRMATION DATES AND DEADLINES .......................................... 8

3.1    Summary of Classification and Treatment of Claims and Interests ...................... 8

3.2    Important Dates and Deadlines ................................................................. 11

SECTION 4 BACKGROUND ................................................................................ 11

4.1    General Background ................................................................................ 11

4.2    Events Leading to Chapter 11 Filing .......................................................... 12

SECTION 5 THE CHAPTER 11 CASE .................................................................... 13

5.1    Petition Date and the Automatic Stay ......................................................... 13

5.2    Schedules, Statements of Financial Affairs, and Claims Bar Date ...................... 13

5.3    Motion for Relief from the Automatic Stay .................................................. 13

SECTION 6 CONFIRMATION AND VOTING PROCEDURES ................................... 14

6.1    Confirmation Hearing ............................................................................. 14

6.2    Procedures for Objections ........................................................................ 14

6.3    Requirements for Confirmation ................................................................. 14

6.4    Classification of Claims and Interests ......................................................... 15

6.5    Impaired Claims or Interests ..................................................................... 16

6.6    Confirmation Without Necessary Acceptances; Cramdown ............................... 17

6.7    Feasibility ............................................................................................ 18

6.8    Best Interests Test and Liquidation Analysis ................................................ 18

6.9    Eligibility to Vote on the Plan .................................................................. 19

6.10   Solicitation Package ............................................................................... 20

6.11   Voting Procedures and Voting Deadline ...................................................... 20

6.12   Acceptance of the Plan ............................................................................ 20

6.13   Plan Injunction, Exculpation, and Releases. ................................................. 20

SECTION 7 CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER
DISCLOSURES ...................................................................................... 22

7.1    Certain Risk Factors to be Considered ........................................................ 22

7.2    Certain U.S. Federal Income Tax Consequences .................................................. 24

7.3    Releases, Exculpations, and Injunctions .............................................................. 27

7.4    Alternatives to the Plan ......................................................................................... 27

SECTION 8 VOTING IN FAVOR OF THE PLAN ..................................................................... 28

8.1    Plan Support .......................................................................................................... 28

EXHIBIT A – THE PLAN OF LIQUIDATION

## DISCLAIMERS

**EACH HOLDER OF A CLAIM AGAINST THE DEBTOR ENTITLED TO VOTE TO ACCEPT OR REJECT THE PLAN SHOULD READ THE PLAN IN ITS ENTIRETY BEFORE VOTING. NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO THE TERMS HEREOF AND SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE. IF YOU ARE ENTITLED TO VOTE TO ACCEPT THE PLAN, YOU ARE RECEIVING A BALLOT WITH YOUR NOTICE OF THE PLAN. THE PLAN PROPONENT URGES YOU TO VOTE TO ACCEPT THE PLAN.**

**THE PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1121 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULES 3016 AND 3017, AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST OR INTERESTS IN THE DEBTOR SHOULD EVALUATE THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED. THE PLAN SHALL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR INTERESTS IN THE DEBTOR. YOU SHOULD CONSULT YOUR PERSONAL COUNSEL OR TAX ADVISOR ON ANY QUESTIONS OR CONCERNS RESPECTING TAX, SECURITIES, OR OTHER LEGAL CONSEQUENCES OF THE PLAN.**

**THE PLAN CONTAINS SUMMARIES OF CERTAIN STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, EVENTS IN THE CHAPTER 11 CASE, AND FINANCIAL INFORMATION. ALTHOUGH THE PLAN PROPONENT BELIEVES THAT THE STATEMENTS AND DESCRIPTIONS CONTAINED IN THE PLAN ARE TRUE AND ACCURATE, THEY ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE DOCUMENTS RELATED TO THE PLAN AND APPLICABLE STATUTORY PROVISIONS. THE TERMS OF THE DOCUMENTS RELATED TO THE PLAN AND APPLICABLE STATUTES GOVERN IN THE EVENT OF ANY DISCREPANCY WITH THE PLAN. CREDITORS AND OTHER INTERESTED PARTIES SHOULD READ THE Plan, THE DOCUMENTS RELATED TO THE PLAN, AND THE APPLICABLE STATUTES THEMSELVES FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.**

**THE FACTUAL STATEMENTS AND REPRESENTATIONS CONTAINED IN THE PLAN ARE MADE BY THE PLAN PROPONENT AS OF THE DATE HEREOF, UNLESS OTHERWISE SPECIFIED, AND THE PLAN PROPONENT DISCLAIMS ANY OBLIGATION TO UPDATE ANY SUCH STATEMENTS AFTER THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN. THE DELIVERY OF THE PLAN SHALL NOT BE DEEMED OR CONSTRUED TO CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME AFTER THE DATE HEREOF.**

THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT NECESSARILY BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

ALL FORWARD-LOOKING STATEMENTS CONTAINED HEREIN OR OTHERWISE MADE BY THE PLAN PROPONENT INVOLVE MATERIAL RISKS AND UNCERTAINTIES AND ARE SUBJECT TO CHANGE BASED ON NUMEROUS FACTORS, INCLUDING FACTORS THAT ARE BEYOND THE PLAN PROPONENT'S CONTROL.  THE PLAN PROPONENT DOES NOT INTEND TO UPDATE OR REVISE THE FORWARD-LOOKING STATEMENTS EVEN IF EXPERIENCE OR FUTURE CHANGES MAKE IT CLEAR THAT ANY PROJECTED RESULTS EXPRESSED OR IMPLIED THEREIN WILL NOT BE REALIZED.

ANY PROJECTED RECOVERIES TO CREDITORS SET FORTH IN THIS PLAN ARE ESTIMATES ONLY.  ALTHOUGH THE PLAN PROPONENT AND ITS ADVISORS HAVE MADE EVERY EFFORT TO VERIFY THE ACCURACY OF THE INFORMATION PRESENTED HEREIN, THE PLAN PROPONENT AND ITS ADVISORS CANNOT MAKE ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ACCURACY OF THIS INFORMATION.

IN CONNECTION WITH THE PLAN PROPONENT'S SOLICITATION OF ACCEPTANCES OF THE PLAN PURSUANT TO SECTION 1126(b) OF THE BANKRUPTCY CODE, THE PLAN PROPONENT IS FURNISHING A SOLICITATION PACKAGE, CONSISTING OF THE PLAN, DISCLOSURE STATEMENT, THE EXHIBITS HERETO, CONFIRMATION NOTICE, AND A BALLOT, TO EACH RECORD HOLDER OF CLAIMS ELIGIBLE TO VOTE OR ITS COUNSEL.  THE PLAN IS TO BE USED BY EACH SUCH ELIGIBLE HOLDER SOLELY IN CONNECTION WITH ITS EVALUATION OF THE PLAN; USE OF THE PLAN FOR ANY OTHER PURPOSE IS NOT AUTHORIZED.  NOTHING STATED IN THE PLAN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING.

# SECTION 1
# INTRODUCTION

SPD II Makaiwa Resort Developments, LLC (the "Debtor") is the debtor-in-possession in the above-captioned chapter 11 bankruptcy case.  Corban Kauai Chicago Lender, LLC ("Secured Lender" or the "Plan Proponent") hereby proposes the following disclosure statement pursuant to sections 1121(a) and 1125(b) of title 11 of the United States Code (the "Disclosure Statement" and the separately filed chapter 11 plan, the "Plan,").  Capitalized terms used in the Disclosure Statement and not otherwise defined have the meanings ascribed to such terms in section 2.

As of the Petition Date, the Debtor was a single asset real estate development project located in a twenty (20) acre resort site in Aleka Loop, Kauai County, Kauai, Hawaii (the "Site").  The Site is located in the Coconut Coast resort area which is a master-planned, mixed-use community well suited for resort use, which expansive ocean views to the east and a mauka backdrop of the Mount Wai'ale'ale.  To the north of the Site is the Courtyard by Marriott Kauai Coconut Beach with a 307 guest, 10.38 acre site.  To the South of the Site is the Wyndham Kauai Coast Resort at the Beachboy, a mix of one- and two-bedroom condominium units.  The Site fronts directly on to the beach.

The Site currently sits vacant as the Debtor is unable to develop the Site into a resort and unable to secure funding to complete its Bankruptcy Case or otherwise progress the case.  The purpose of the Plan and Disclosure Statement is to provide for an orderly wind-down of the Debtor's Estate and to distribute the remaining proceeds of the sale and any other cash, property, or interests that the Debtor retained following consummation of the sale to the holders of Allowed Claims in accordance with the terms of the Plan and Disclosure Statement and the claims priority provisions of the Bankruptcy Code.

The Plan Proponent submits that the Plan and Disclosure Statement will be distributed to all holders of Claims and Interests in accordance with section 1125(b) of the Bankruptcy Code; Rules 2002, 3016, and 3017 of the Federal Rules of Bankruptcy Procedure; and the Bankruptcy Court's order approving the Disclosure Statement.  See Doc. No. ____.[1]  The Disclosure Statement and the exhibit hereto include a discussion of:  (i) the nature and history of the Debtor's business and liabilities; (ii) events during the Chapter 11 Case; (iii) the requirements for confirmation of the Plan and procedures for voting to accept or reject the Plan; (iv) additional factors and disclosures to be considered, including risk factors and certain U.S. federal income tax consequences of the Plan; and (v) the terms of the Plan, including the treatment of holders of Claims and Interests under the Plan.  The Disclosure Statement was prepared with the intent to provide "adequate information" (as defined in the Bankruptcy Code) to enable holders of Claims against and Interests in the Debtor to make informed judgments about the Plan.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Proponent expressly reserves the right to alter, amend, or modify the Plan and Disclosure Statement, one or more times, before substantial consummation thereof.

---

[1]  As used throughout the Plan, "Doc. No." refers to the electronic case file number for a particular document on the Court's docket for these Chapter 11 Cases jointly administered under Case No. 23-7153.

*Please read the Plan and Disclosure Statement, the exhibit, other supporting materials, and any appropriate ballot carefully and follow the instructions set forth below and on the appropriate ballot to vote on the Plan. The Plan Proponent believes that the Plan provides the best method of maximizing the recoveries for the holders of Claims against the Debtor. Therefore, the Plan Proponent recommends that all creditors who are entitled to vote should vote in favor of the Plan.*

Unless otherwise specified, all section or exhibit references in the Plan and Disclosure Statement are to the respective section in, or exhibit to, the Plan and Disclosure Statement, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to the Plan and Disclosure Statement as a whole and not to any particular section, subsection, or clause contained herein. The headings in the Plan and Disclosure Statement are for convenience of reference only and shall not limit or otherwise affect the provisions hereof. For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; and (c) unless otherwise noted above, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply.

## SECTION 2
## DEFINITIONS

The capitalized terms used herein shall have the meanings set forth below. Terms used herein and not otherwise defined shall have the meanings given to them in the Bankruptcy Code or the Bankruptcy Rules unless the context requires otherwise.

**2.1** *Administrative Bar Date* means the date which shall be thirty (30) days after the Confirmation Date, by which proofs of claim or applications for payment of Administrative Claims arising from the Petition Date and through the Confirmation Date must be filed with the Court, with copies to the parties listed in section 13.11 of the Plan.

**2.2** *Administrative Claim* means a Claim for a cost or expense of administration of the Chapter 11 Case, other than a Fee Claim, allowable under section 503(b) of the Bankruptcy Code, and referred to in section 507(a)(1) of the Bankruptcy Code, including the actual, necessary costs and expenses incurred after the commencement of the Chapter 11 Case of preserving the Estate.

**2.3** *Allowed* means, with respect to any Claim, a Claim, subject to section 8.1 of the Plan, (i) which is scheduled as undisputed, noncontingent and liquidated in the Schedules, or any amendment to the Schedules, and as to which no proof of Claim has been timely filed; (ii) as to which a proof of Claim has been timely filed in a liquidated, non-contingent amount and either (a) no objection thereto has been timely filed, or (b) such Claim has been allowed (but only to the extent allowed) by a Final Order of the Court; (iii) which has been expressly allowed under the provisions of this Plan; or (iv) which is an Administrative Claim to which no objection has been asserted, or which has been approved by Final Order of the Court. An Allowed Claim: (x) includes

-2-

a previously Disputed Claim to the extent such Disputed Claim becomes Allowed when the context so requires; and (y) shall be net of any valid setoff or recoupment amount against such Claim based on a valid offset or recoupment right, which valid setoff or recoupment amount shall be deemed to have been setoff or recouped in accordance with the provisions of this Plan. Unless otherwise specified herein or by order of the Court, Allowed Claims shall not, for any purpose under the Plan, include interest on such Claims on or after the Petition Date.

2.4    **Ballot** means the ballot distributed to each eligible claimant by the Balloting Agent, on which ballot such claimant may, inter alia, vote for or against the Plan.

2.5    **Ballot Deadline** means the date and time set by the Court by which the Balloting Agent must receive all Ballots.

2.6    **Balloting Agent** means Reed Smith LLP, 10 S. Wacker Drive, Suite 4000, Chicago, Illinois 60606, Attn:  Ann E. Pille.

2.7    **Bankruptcy Code** means title 11 of the United States Code, as now in effect or hereafter amended.

2.8    **Bankruptcy Court** means the United States Bankruptcy Court for the Northern District of Illinois, or any other court exercising competent jurisdiction over the Chapter 11 Case or any proceeding therein.

2.9    **Bankruptcy Rules** means the Federal Rules of Bankruptcy Procedure and any applicable local rules of the Bankruptcy Court as now in effect or hereafter amended.

2.10   **Bar Date** means (i) November 9, 2023 for any claimant other than a Governmental Unit, (ii) February 26, 2024 for Governmental Units, and (iii) such other date(s) fixed by order(s) of the Bankruptcy Court, by which all Persons, including Governmental Units, asserting a Claim against the Debtor, must have filed a Claim or Administrative Claim or be forever barred from asserting such Claim.

2.11   **Business Day** means any day except a Saturday, Sunday, or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

2.12   **Cash** means cash and cash equivalents, including, but not limited to, bank deposits, checks, and other similar items.

2.13   **Chapter 11 Case** means the chapter 11 case of the Debtor pending before the Bankruptcy Court.

2.14   **Claim** means a claim against the Debtor, whether or not asserted, known or unknown, as such term is defined in section 101(5) of the Bankruptcy Code.

2.15   **Claimant** means the holder of a Claim.

2.16   **Class** means a group of Claims as described in Articles III and IV of the Plan.

**2.17**    ***Confirmation Date*** means the date the Court enters the Confirmation Order on its docket.

**2.18**    ***Confirmation Hearing***. means the hearing by the Court to consider confirmation of the Plan.

**2.19**    ***Confirmation Order*** means the order of the Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

**2.20**    ***Creditor Carve Out*** means the lesser amount of (a) ten percent of the aggregate of Allowed Priority Tax Claims, Allowed Priority Non-Tax Claims and Allowed General Unsecured Claims, or (b) $250,000.

**2.21**    ***Creditor Carve Out Source*** means: (A) first, the proceeds of the Estate Causes of Action Sale, and (B) second, to the extent the proceeds of the Estate Causes of Action Sale are insufficient to fully fund the Creditor Carve Out, either: (i) proceeds of Property Sale to which the Secured Lender is otherwise entitled, if the Property is purchased by a Person other than the Secured Lender at the Property Sale, or (ii) the Secured Lender, if the Secured Lender is the successful purchaser of the Property at the Sale.

**2.22**    ***Debtor*** shall have the meaning ascribed to it in the preamble of this Plan.

**2.23**    ***Disallowed Claim*** means a Claim or portion thereof that (i) has been disallowed by a Final Order of the Court; (ii) is identified in the Schedules in an amount of zero dollars or as contingent, unliquidated, or disputed and as to which a proof of Claim was not filed by the Bar Date; or (iii) is not identified in the Schedules and as to which no proof of Claim has been filed or deemed filed by the Bar Date.

**2.24**    ***Disclosure Statement Order*** means the order of the Bankruptcy Court approving the Disclosure Statement as containing adequate information pursuant to section 1125 of the Bankruptcy Code.

**2.25**    ***Disputed Claim*** means any Claim or any portion thereof which has not become Allowed, which is not a Disallowed Claim, or against which an objection to the allowance thereof has heretofore been or is hereafter interposed and which has not been allowed by Final Order; provided, however, that nothing in this definition of "Disputed Claim" is intended to or does impair the rights of any holder of a Disputed Claim to pursue its rights under section 502(c) of the Bankruptcy Code. Without limiting any of the foregoing, but subject to the provisions of this Plan, a Claim that is or becomes the subject of an application, motion, complaint, objection, or any other legal proceeding seeking to disallow, limit, subordinate, or estimate such Claim, shall be deemed to constitute a Disputed Claim.

**2.26**    ***Distribution*** means the distribution to be made to holders of Allowed Claims pursuant to the Plan.

**2.27**    ***Distribution Address*** means the address set forth in the relevant proof of Claim. If no proof of Claim is filed in respect to a particular Claim, such defined term means the address set forth in the Debtor's Schedules.

**2.28** *Distribution Date* means the later of (a) ten (10) days after the closing of the Sale, or (b) ten (10) days after all Disputed Claims become Allowed Claims, provided however that the Distribution Date may occur after the closing of the Sale but before such time as all Disputed Claims become Allowed Claims, as long as there is established a reserve consisting of the full amount of all Disputed Claims, from which such Disputed Claims shall be paid if and to the extent they become Allowed Claims.

**2.29** *Effective Date* means the first Business Day after the date each of the conditions set forth in section 11.1 of the Plan has been satisfied.

**2.30** *Estate* means the estate created in the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

**2.31** *Estate Causes of Action* means the actions commenced or to be commenced to recover monies for the Estate under Chapter 5 of the Bankruptcy Code, or any actions or proceedings commenced or to be commenced for the benefit of the Estate, and expressly excludes the Property Causes of Action, as that term is defined in section 7.3 of the Plan.

**2.32** *Estate Causes of Action 363 Motion* means a motion pursuant to section 363 of the Bankruptcy Code for approval of the Estate Causes of Action Sale.

**2.33** *Estate Causes of Action Sale* means the sale of the Estate Causes of Action pursuant to the terms of this Plan and the Estate Causes of Action 363 Motion.

**2.34** *Equity Interest* means an equity interest, within the meaning of section 101(16) of the Bankruptcy Code, in the Debtor.

**2.35** *Excess Debtor Proceeds* shall have the meaning ascribed in Article II of the Plan.

**2.36** *Fee Claim* means a Claim for compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331 or 503(b) of the Bankruptcy Code in connection with the Chapter 11 Case.

**2.37** *Fee Claims Bar Date* means a date which shall be thirty (30) days after the Confirmation Date, by which date all applications for payment of Fee Claims for services rendered through the Confirmation Date must be filed with the Court.

**2.38** *Final Order* means an order or judgment of the Court, as entered on the docket of the Court, that has not been reversed, stayed, modified, or amended, and as to which: (a) the time to appeal, seek review or rehearing or petition for certiorari has expired and no timely filed appeal or petition for review, rehearing, remand or certiorari is pending; or (b) any appeal taken or petition for certiorari filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought, provided, however, that the possibility that a motion under Rule 59 or Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules or other rules governing procedure in cases before the Bankruptcy Court, could be filed with respect to such order shall not cause such order not to be a Final Order.

**2.39** *General Unsecured Claim* means any Claim that is not an Administrative Claim, Fee Claim, Priority Non-Tax Claim, Priority Tax Claim, Secured Real Estate Tax Claim, Lender Secured Claim or Equity Interest.

**2.40** *Governmental Unit* has the meaning set forth in Section 101(27) of the Bankruptcy Code.

**2.41** *Lender Secured Claim* means the claim of the Lender in the amount of not less than $23,341,623.54 as of the Petition Date, secured by a first priority mortgage against the Property; provided that, in the event that the gross Sale proceeds are in excess of $23,341,623.54, Lender reserves the right to seek post-petition interest and attorneys' fees.

**2.42** *Person* means any individual, corporation, partnership, association, organization, joint stock company, joint venture, estate, trust, governmental unit or any political subdivision thereof, interest holders, holders of Claims, current or former employees of the Debtor, or any other entity.

**2.43** *Petition Date* means May 31, 2023.

**2.44** *Plan* means this Chapter 11 Plan that is set forth in the Plan of Liquidation dated as of February 28, 2024, together with any amendments or modifications hereto as may be filed hereafter in accordance with the terms of the Plan, the Bankruptcy Code and other applicable law.

**2.45** *Priority Non-Tax Claim* means any Claim entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim, Fee Claim, and Priority Tax Claim.

**2.46** *Priority Tax Claim* means a Claim entitled to priority pursuant to section 507(a)(8) of the Bankruptcy Code, other than a Secured Real Estate Tax Claim.

**2.47** *Professional Fee Carve Out* means the amount of $20,000 from the proceeds of the Sale to which the Lender is otherwise entitled, which amount will be used to pay up to $20,000 to the holders of Allowed Fee Claims, provided, however, that if Allowed Fee Claims are equal to less than $20,000, and excess shall be remitted to the Secured Lender.

**2.48** *Property* means the 20.9 acres of land in at Waipouli, District of Puna, Island and County of Kauai, State of Hawaii, identified as Lots 5, 6, 8 as shown on Map 6, as amended, filed with Land Court application No. 1166 of Edward Henry Walton Broadbent, and all rights and claims related thereto that run with such real property.

**2.49** *Property 363 Motion* means a motion pursuant to section 363 of the Bankruptcy Code for approval of the Sale of the Property, free and clear of all liens, claims and encumbrances.

**2.50** *Property Bidding Procedures Motion* means a motion filed contemporaneously with the Property 363 Motion pursuant to which the Debtor will seek approval of certain bidding procedures related to the Property Sale.

**2.51** *Property Entitlements* means all federal, state and local governmental permits, licenses, certificates, and approvals issued or existing in connection with the ownership, development or operation of the Property, including but not limited to that certain Special Management Area Permit (SMA(U)-2006-4), Class IV Zoning permit (Z-IV-2006-9), and Project Development Use permit (PDU-2006-6) covering the Property, as issued on January 24, 2007 and modified via Judge Susan Oki Mollway's amended final judgment on December 2, 2016, and any and all other permits, licenses or other written statements or certificates evidencing permission from a governmental agency or official that allows for any uses, activities, or operations on the Property, which shall include, without limitation: (i) placement or erection of any solid material or any gaseous, liquid, solid, or thermal waste; (ii) grading, removing, dredging, mining, or extraction of any materials; (iii) change in the density or intensity of use of land, including but not limited to the division or subdivision of land; (iv) change in the intensity of use of water, ecology related thereto, or of access thereto; and (v) construction, reconstruction, or alteration of the size of any structure and, for the avoidance of doubt, all Property Entitlements shall be deemed to be in effect on the Effective Date and shall remain in effect for ten (10) years from the Effective Date.

**2.52** *Property Sale* means the sale of the Property free and clear of all liens, claims and encumbrances pursuant to the terms of this Plan and the 363 Motion.

**2.53** *Sale Expenses* mean the following costs and expenses associated with the Sale: brokers' commissions, auctioneers' costs, necessary and customary closing costs and United States Trustee Fees due under the Plan. Sale Expenses shall not include any Secured Real Estate Tax Claim which shall be paid from the net proceeds of Sale, or transfer taxes, which are exempt from payment under section 1146 of the Bankruptcy Code.

**2.54** *Schedules* means the Debtor's schedules of assets and liabilities filed with the Court pursuant to sections 521(a)(1) and 1106(a)(2) of the Bankruptcy Code, as the same may have been, or may hereafter be, amended.

**2.55** *Secured Claim* means, pursuant to section 506 of the Bankruptcy Code, that portion of a Claim that is secured by a valid, perfected and enforceable security interest, lien, mortgage or other encumbrance, that is not subject to avoidance or disallowance under applicable bankruptcy or non-bankruptcy law, in or upon any right, title or interest of the Debtor's interest in property of the Estate, to the extent of the value of the Debtor's interest in such property as of the relevant determination date. The defined term Secured Claim includes any Claim that is: (i) subject to an offset right and the holder of such Secured Claim under applicable law; and (ii) a secured claim against the Debtor pursuant to sections 506(a) and 553 of the Bankruptcy Code.

**2.56** *Secured HOA Claims* means the secured claim in the amount of $16,887 owed to Coconut Plantation Association in connection with secured property assessments payable in a position senior to the Secured Lender's claims against the Property pursuant to applicable state law.

**2.57** *Secured Lender* means Corban Kauai Chicago Lender LLC, a creditor holding a secured claim against the Property.

**2.58**   ***Secured Real Estate Tax Claim*** means a Claim for real estate taxes due and owing in connection with the Property that is secured by a lien against the Property.

**2.59**   ***Stalking Horse Bidder*** means the entity that will be proposed as the Stalking Horse Bidder in the Property 363 Motion.

**2.60**   ***Unclaimed Property*** means any Cash unclaimed after ninety (90) days following the Distribution Date as provided in section 8.4 of the Plan. Unclaimed Property shall include: (a) checks (and the funds represented thereby) mailed to a Distribution Address and returned as undeliverable without a proper forwarding address; (b) funds for uncashed checks; and (c) checks (and the funds represented thereby) not mailed or delivered because no Distribution Address to mail or deliver such property was available, notwithstanding efforts to locate such address which were reasonable under the circumstances as provided for in the Plan.

**2.61**   ***United States Trustee*** means the Office of the United States Trustee for the Northern District of Illinois.

**2.62**   ***United States Trustee Fees*** means fees payable pursuant to the applicable schedule pursuant to 28 U.S.C. § 1930(a)(6) and any interest thereon pursuant to 31 U.S.C. § 3717.

**SECTION 3**
**SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND
INTERESTS UNDER PLAN AND IMPORTANT SOLICITATION AND
CONFIRMATION DATES AND DEADLINES**

**3.1**   ***Summary of Classification and Treatment of Claims and Interests***.

All Claims against or Interests in the Debtor, other than Administrative Expense Claims are classified for purposes of voting and Distribution under the Plan. A summary of the classification of these Claims and Interests, the proposed treatment of each Class of Claims or Interests, and the voting status of each Class of Claims or Interests follows.

| Class | Treatment | Status | Voting |
|-------|-----------|--------|--------|
| 1 | Secured Lender Claim - Lender Secured Claim, the Secured Lender shall shall receive either (a) title to the Property if the net proceeds of the Property Sale after payment of Sale Expenses and the Secured Real Estate Taxes are less than $20,000,001 and the Secured Lender exercises its right to credit bid under section 363(k) of the Bankruptcy Code; or (b) $20,000,001 (less the amount of the Professional Fee Carve Out and the Creditor Carve Out, which will be retained by the Estate for distribution to holders of Allowed Fee Claims and Claimants entitled to receive distribution from the Creditor Carve Out on account of their Allowed Claims), as well as (y) 50% of amounts above $20,000,001 net of Sale Expenses, | May Be Impaired | Yes |

| Class | Treatment | Status | Voting |
|---|---|---|---|
|  | Secured Real Estate Tax Claims and Secured HOA Claims, up to the full amount of the Lender Secured Claim. From the proceeds to which the Secured Lender is otherwise entitled, the Secured Lender shall pay the Professional Fee Carve Out and the Creditor Carve Out to the Debtor for payments under the Plan. Any deficiency in payment of the Lender Secured Claim shall be waived and released by the Lender as against the Debtor. Upon receipt of the Distribution to which the Lender is entitled, the Lender's lien against the Property shall be released and satisfied. The Secured Lender has agreed to its treatment under this Plan and will vote in favor of the Plan. |  |  |
| 2 | Secured Real Estate Tax Claims and Secured HOA Claims - Class 2 under the Plan consists of Secured Real Estate Tax Claims and Secured HOA Claims. Secured Real Estate Tax Claims and Secured HOA Claims shall be paid in full at the Closing from the proceeds of Property Sale or by the Secured Lender in the event that the Lender receives title to the Property pursuant to section 5.1 of the Plan, unless the Secured Lender elects to take title to the Property subject to such Secured Real Estate Tax Claims. In the event such Claims are not Allowed at the Closing, the full amount of such Claims shall be escrowed pending allowance and shall be paid as soon as reasonably practicable after Allowance of such Claims with any disallowed portion of such Claims being returned within five (5) business days of such Claim becoming a Disallowed Claim in whole or in part (a) to the Secured Lender, if the Lender Secured Claim has not been paid in full or (b) to the Estate, if the Lender Secured Claim has been paid in full. Upon receipt of the Distribution to which a holder of Claims in this Class is entitled, such Claimant's lien against the Property shall be deemed released and satisfied. | Unimpaired | No |
| 3 | Other Secured Claims - Class 3 of the Plan consists of all Secured Claims other than the Lender Secured Claim, the Secured Real Estate Tax Claims and the Secured HOA Claims. The Other Secured Claims shall be entitled to the *pro rata* distribution of fifty cents of each dollar ($ 0.50) of Sale proceeds after payment of Sale Expenses, the Secured Real Estate | May Be Impaired | Yes |

| Class | Treatment | Status | Voting |
|---|---|---|---|
|  | Taxes, and the Secured HOA Claims in excess of $20,000,000, up to the full amount of the Other Secured Claims. Any deficiency in payment of the Other Secured Claims shall be treated as a General Unsecured Claim. Upon receipt of the Distribution to which any Claimant of an Other Secured Claim is entitled, such Claimant's lien against the Property shall be released and satisfied. |  |  |
| 4 | Non-Real Estate Tax Priority Claims - The Plan Proponent is unaware of any Priority Claims other than Real Estate Tax Priority Claims. In the event that such a Claim is filed and becomes Allowed, the holder of an Allowed Non-Real Estate Tax Priority Claim shall be paid on or as soon as reasonably practicable after the Distribution Date *pro rata* from the Creditor Carve Out and the Excess Debtor Proceeds up to the full amount of their Claims. The holder of an Allowed Non-Real Estate Tax Priority Claim may receive such other less favorable treatment as may be agreed upon by the Claimant and the Plan Proponent. | May Be Impaired | Yes |
| 5 – The Plan Proponent expects Allowed Claims in Class 5 to receive 5-10% recovery | General Unsecured Claims - Class 5 consists of any Claim that is not an Administrative Claim, Fee Claim, Priority Tax Claim, Secured Real Estate Tax Claim, Lender Secured Claim, Other Secured Claim, or an Equity Interest. Each holder of an Allowed General Unsecured Claim shall be paid *pro rata* from the Creditor Carve Out after the distribution of amounts due to Non-Real Estate Tax Priority Claims, up to the full amount of their Allowed Claims. | May Be Impaired | Yes |
| 6 – The Plan Proponent expects Equity Interests to receive a 0% recovery | Equity Interests - Class 6 includes the holders of Equity Interests in the Debtor. Such holders shall receive any remaining proceeds of Sale after payment of all Allowed Claims | May Be Impaired | Yes |

**3.2** *Important Dates and Deadlines*.

| Event | Date |
|---|---|
| Voting Record Date | April 4, 2024 |
| Solicitation Commences | April 5, 2024 |
| Voting Deadline | May 8, 2024, at 4:00 p.m. (Central). |
| Plan Objection Deadline | May 8, 2024, at 4:00 p.m. (Central) |
| Deadline to File any Replies, Confirmation Brief and Other Evidence Supporting the Plan | May 13, 2024, at 4:00 p.m. (Central) |
| Deadline to File Voting Certification | May 13, 2024 |
| Confirmation Hearing | May 15, 2024, at 11:00 a.m. (Central) |

## SECTION 4
## BACKGROUND

**4.1** *General Background*.

<u>The Debtor's Business</u>.

As of the Petition Date, the Debtor was a single asset real estate development project located in a twenty (20) acre resort site in Aleka Loop, Kauai County, Kauai, Hawaii (the "Site"). The Site is located in the Coconut Coast resort area which is a master-planned, mixed-use community well suited for resort use, which expansive ocean views to the east and a mauka backdrop of the Mount Wai'ale'ale. To the north of the Site is the Courtyard by Marriott Kauai Coconut Beach with a 307 guest, 10.38 acre site. To the South of the Site is the Wyndham Kauai Coast Resort at the Beachboy, a mix of one- and two-bedroom condominium units. The Site fronts directly on to the beach.

<u>The Debtor's Corporate Structure</u>.

The Debtor is a limited liability company organized and existing under the laws of the State of New York. The Debtor's manager is Jason Wei Ding.

<u>The Debtor's Capital Structure</u>.

The Debtor funded its acquisition of the Property through a loan with the Secured Lender. On or about May 23, 2017, the Debtor entered into a loan agreement with Secured Lender pursuant to which Secured Lender loaned the Debtor the principal amount of $6,500,000.00 (the "<u>Loan</u>") for the purpose of financing the development of the Makaiwa Project. The Debtor executed and delivered to Secured Lender a promissory note in the original principal amount of $6,500,000.00, a Mortgage, Security Agreement, Assignment of Rents, Fixture Filing and Financing Statement dated May 23, 2017 ("<u>Mortgage</u>"), to secure full payment and the performance by the Debtor of

all obligations under the Loan and Mortgage.  The property to which the Mortgage attached included the Debtor's fee simple interest in the Site.

On July 25, 2018, Secured Lender and the Debtor entered into a Forbearance and Loan Modification Agreement, under which the principal amount of the Note secured by the Mortgage was increased to the new amount of $9,914,000.00 and the maturity date for the loan extended until September 30, 2017.  Thereafter, on October 12, 2018, Secured Lender and the Debtor entered into a Second Forbearance and Loan Modification Agreement under which the principal amount of the Note secured by the Mortgage was amended to the new amount of $10,406,080.45, maturity date for the loan was extended until November 30, 2018.

## 4.2  *Events Leading to Chapter 11 Filing.*

As of the Petition Date, the Property was the subject of a state court foreclosure action that was commenced by the Secured Lender in March 2019, and pending *as Corban Kauai Chicago Lender, LLC v. SPD II Makaiwa Resort Development, LLC*, *et al.,* Civil No. 5CC191000034 JKW, Circuit Court of the Fifth Circuit, State of Hawaii (the "State Court Foreclosure Action").

Judgment for foreclosure was entered in favor of Secured Lender, and against the Debtor, in the State Court Foreclosure Action on February 4, 2021, and neither the Debtor's liability to Secured Lender, nor the fact that such indebtedness is secured by a lien against the Property, is legitimately in dispute.

Pursuant to the order underlying the foreclosure judgment entered in the State Court Foreclosure Action—the Order Granting Secured Lender's Motion for Default Judgment and Summary Judgment and for Decree of Foreclosure was entered May 13, 2022 ("Foreclosure Order").  The Hawaii state court has already determined that the Debtor owed Secured Lender $17,444,842.04 as of January 31, 2021, plus per diem interest of $6,937.39 for each day thereafter that the indebtedness remained outstanding.  In the 864 days from January 31, 2021 through June 14, 2023, the per diem interest, alone, is equal to nearly six million dollars, for a total outstanding claim owed to Secured Lender of more than $23.4 million, not including additional protective advances.

As part of the State Court Foreclosure Action, and in order to maximize the value of the Property, the Property was actively marketed for private sale through Colliers International, LLC ("Colliers"), Hawaii's largest commercial real estate organization, pursuant to the state court's order authorizing private sale.

Colliers extensively marketed the Property in an effort to achieve the highest reasonably possible interest in the Property, including creating marketing brochures and information, and listing the Property on multiple databases to reach more than 30,000 potential real estate investors. More than 45 potential investors signed confidentiality agreements and received a more detailed Offering Memorandum from Colliers that further described the Property.  The highest offer to have come from that sale process was $19,000,000 (the "Highest Private Sale Property Bid").

On May 11, 2022, Secured Lender filed a motion to confirm the sale of the Property in the State Court Foreclosure Action (the "Sale Conformation Motion"), and that motion was originally scheduled to be heard on June 1, 2022.  On May 27, 2022, three business days prior to the hearing

-12-

on the Sale Confirmation Motion, an "involuntary" petition was filed against the Debtor in the Hawaii Bankruptcy Court, and docketed as Case No. 22-355 (the "Hawaii Bankruptcy Case").

On June 28, 2023, Secured Lender filed a motion for relief from stay in the Hawaii Bankruptcy Case to proceed with the State Court Foreclosure Action, and, on August 9, 2022, Secured Lender's motion for relief from stay was granted.  On September 13, 2022, following the filing of a motion to dismiss by the Debtor, the Hawaii bankruptcy court entered a stipulation dismissing the Hawaii Bankruptcy Case.

Thereafter, the parties attempted to proceed with an anticipated private sale of the Property to an interested third party purchaser, with the consent and approval of the Hawaii foreclosure court.  But, on April 17, 2023, Secured Lender provided notice to the Hawaii foreclosure court that the private sale and failed to close and that Secured Lender intended to proceed with a public auction of the Property.  The public auction was scheduled for May 31, 2023, but was stayed as a result of the Debtor's bankruptcy petition.

**SECTION 5**
**THE CHAPTER 11 CASE**

The following is a brief description of certain material events that have occurred during the Chapter 11 Case.

**5.1      *Petition Date and the Automatic Stay*.**

On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court.  An immediate effect of commencement of the Chapter 11 Case was the imposition of the automatic stay under the Bankruptcy Code which, with limited exceptions, enjoins the commencement or continuation of all collection efforts by creditors, the enforcement of liens against property of the Debtor.

**5.2      *Schedules, Statements of Financial Affairs, and Claims Bar Date*.**

The Debtor filed its Schedules of Assets and Liabilities and Statement of Financial Affairs on June 27, 2023.  *See* Doc. No. 22.  A creditor whose Claim is set forth in the Schedules of Assets and Liabilities and not identified as contingent, unliquidated, or disputed was permitted, but not required, to file a proof of claim against the Debtor in order to participate in the Chapter 11 Case or receive a distribution under the Plan.

By order dated September 6, 2023, the Court established November 9, 2023 as the deadline for holders of Claims to file Proofs of Claim against the Debtor.  *See* Doc. No. 60.  In addition, governmental units that are creditors are required to file Proofs of Claim by February 26, 2024.

**5.3      *Motion for Relief from the Automatic Stay*.**

On June 14, 2023, Secured Lender filed its *Motion for Relief from Stay to Proceed with Foreclosure Action* [Doc. No. 13].  On November 7, 2023, the Bankruptcy Court entered the *Stipulation and Agreed Order Granting Corban Kauai Chicago Lender LLC's Motion for Relief from Stay to Proceed with Foreclosure Action* [Doc. No. 95] (the "Stay Relief Order").  Pursuant

to the Stay Relief Order, Secured Lender obtained relief from the automatic stay to pursue foreclosure, at its discretion. Rather than seek to foreclose on the Property, Secured Lender seeks to implement a section 363 sale process, which Secured Lender believes will provide a greater recovery to stakeholders, including unsecured creditors, then would be available in a State Court Foreclosure Action.

## SECTION 6
## CONFIRMATION AND VOTING PROCEDURES

**6.1**     *Confirmation Hearing*.

On _____ 2024, the Bankruptcy Court entered the Order Approving the Disclosure Statement for solicitation purposes only and authorizing the Plan Proponent to solicit the Plan. The Confirmation Hearing has been scheduled for _____ _.m. (prevailing **Central Time)** to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code. The Confirmation Hearing may be adjourned from time to time by the Plan Proponent without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by filing a notice with the Bankruptcy Court.

At the confirmation hearing, the Plan Proponent will seek an order from the Bankruptcy Court seeking approval of the Plan and requiring that the Property 363 Motion be filed within ten (10) business days of the Confirmation Order, the Debtor will file the Property 363 Motion in a form and manner that is acceptable to the Plan Proponent and the Stalking Horse Bidder. The Property 363 Motion will provide for a sale of the Property free and clear of all liens, claims, and interests, pursuant to section 363(f) of the Bankruptcy Code and find that the purchaser of the Property is a good faith purchaser pursuant to section 363(m) of the Bankruptcy Code.

Additionally, the Property 363 Motion will provide the Stalking Horse Bidder with a customary break-up fee of 1.5% and an expense reimbursement claim of 1.0%, both of which shall be paid to the Stalking Horse Bidder at the Sale Closing if the Stalking Horse Bidder is not the purchaser. The Property 363 Motion will also require a marketing period of thirty (30) days pursuant to which higher and better offers will be accepted pursuant to the certain bidding procedures approved in connection with the Property Bidding Procedures Motion.

**6.2**     *Procedures for Objections*.

Any objection to final approval of the Plan must be made in writing and filed with the Bankruptcy Court by no later than _____ _.m. (prevailing **Central Time)** and be served in accordance with the local rules of the Bankruptcy Court. **Unless an objection is timely filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.**

**6.3**     *Requirements for Confirmation*.

The Bankruptcy Court will confirm the Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code. Among the requirements for confirmation in the Chapter 11 Cases is that the Plan be: (i) accepted by all Impaired Classes of Claims and Interests or, if rejected by an Impaired Class, that the Plan "does not discriminate unfairly" against, and is "fair

and equitable" with respect to, such Class; and (ii) feasible.  The Bankruptcy Court must also find that:

    a.  the Plan has classified Claims and Interests in a permissible manner;

    b.  the Plan complies with the technical requirements of Chapter 11 of the Bankruptcy Code; and

    c.  the Plan has been proposed in good faith.

The Plan Proponent believes that the Plan complies, or will comply, with all such requirements.

**6.4**  ***Classification of Claims and Interests***.

    Section 1123 of the Bankruptcy Code provides that a plan must classify the claims and interests of a debtor's creditors and equity interest holders.  In accordance with section 1123 of the Bankruptcy Code, the Plan divides Claims and Interests into Classes and sets forth the treatment for each Class (other than those claims which pursuant to section 1123(a)(1) of the Bankruptcy Code need not be and have not been classified).

    Section 1122 of the Bankruptcy Code requires the Plan to place a Claim or Interest in a particular Class only if such Claim or Interest is substantially similar to the other Claims or Interests in such class.  The Plan creates separate Classes to deal respectively with Priority Non-Tax Claims, various Secured Claims, General Unsecured Claims, and Interests.  The Plan Proponent believes that the Plan's classifications place substantially similar Claims or Interests in the same Class and, thus, meet the requirements of section 1122 of the Bankruptcy Code.

    The Bankruptcy Code also requires that a plan provide the same treatment for each claim or interest of a particular class unless the claim holder or interest holder agrees to a less favorable treatment of its claim or interest.  The Plan Proponent believes that the Plan complies with such standard.  If the Court finds otherwise, however, it could deny confirmation of the Plan if the holders of Claims or Interests affected do not consent to the treatment afforded them under the Plan.

    A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes.  A Claim also is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim in that Class and such Claim has not been paid, released, or otherwise settled prior to the Effective Date.

    The Plan Proponent believes that the Plan has classified all Claims and Interests in compliance with the provisions of section 1122 of the Bankruptcy Code and applicable case law. It is possible that a holder of a Claim or Interest may challenge the Plan Proponent's classification of Claims or Interests and that the Court may find that a different classification is required for the Plan to be confirmed.  If such a situation develops, the Plan Proponent intends, in accordance with the terms of the Plan, to make such permissible modifications to the Plan as may be necessary to permit its confirmation.  Any such reclassification could adversely affect holders of Claims by

changing the composition of one or more Classes and the vote required of such Class or Classes for approval of the Plan.

**EXCEPT AS SET FORTH IN THE PLAN, UNLESS SUCH MODIFICATION OF CLASSIFICATION MATERIALLY ADVERSELY AFFECTS THE TREATMENT OF A HOLDER OF A CLAIM AND REQUIRES RE-SOLICITATION, ACCEPTANCE OF THE PLAN BY ANY HOLDER OF A CLAIM PURSUANT TO THIS SOLICITATION WILL BE DEEMED TO BE A CONSENT TO THE PLAN'S TREATMENT OF SUCH HOLDER OF A CLAIM REGARDLESS OF THE CLASS AS TO WHICH SUCH HOLDER ULTIMATELY IS DEEMED TO BE A MEMBER.**

The amount of any Impaired Claim that ultimately is Allowed by the Court may vary from any estimated Allowed amount of such Claim and, accordingly, the total Claims that are ultimately Allowed by the Court with respect to each Impaired Class of Claims may also vary from any estimates contained herein with respect to the aggregate Claims in any Impaired Class. Thus, the actual recovery ultimately received by a particular holder of an Allowed Claim may be adversely or favorably affected by the aggregate amount of Claims Allowed in the applicable Class. Additionally, any changes to any of the assumptions underlying the estimated Allowed amounts could result in material adjustments to recovery estimates provided herein or the actual Distribution received by creditors. The projected recoveries are based on information available to the Plan Proponent as of the date hereof and reflect the Plan Proponent's view as of the date hereof only.

The classification of Claims and Interests and the nature of distributions to members of each Class are summarized herein. The Plan Proponent believes that the consideration, if any, provided under the Plan to holders of Allowed Claims reflects an appropriate resolution of their Allowed Claims taking into account the differing nature and priority of such Claims and Interests. The Bankruptcy Court must find, however, that a number of statutory tests are met before it may confirm the Plan. Many of these tests are designed to protect the interests of holders of Claims or Interests who are not entitled to vote on the Plan, or do not vote to accept the Plan, but who will be bound by the provisions of the Plan if it is confirmed by the Bankruptcy Court.

**6.5** *Impaired Claims or Interests*.

Pursuant to section 1126 of the Bankruptcy Code, only the holders of Claims in Classes Impaired by the Plan and receiving a payment or Distribution under the Plan may vote to accept or reject the Plan. Pursuant to section 1124 of the Bankruptcy Code, a Class of Claims may be Impaired if the Plan alters the legal, equitable, or contractual rights of the holders of such Claims or Interests treated in such Class. The holders of Claims not Impaired by the Plan are deemed to accept the Plan and do not have the right to vote on the Plan. The holders of Claims or Interests in any Class which will not receive any payment or Distribution or retain any property pursuant to the Plan are deemed to reject the Plan and do not have the right to vote. Finally, the holders of Claims or Interests whose Claims or Interests are not classified under the Plan are not entitled to vote on the Plan.

Under the Plan, holders of Claims in the Voting Classes are Impaired and are entitled to vote to accept or reject the Plan.  Holders of Claims in Class 2 are Unimpaired and, therefore, not entitled to vote on the Plan and are deemed to accept the Plan.

**ACCORDINGLY, A BALLOT FOR ACCEPTANCE OR REJECTION OF THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS IN THE VOTING CLASSES.**

**6.6**      *Confirmation Without Necessary Acceptances; Cramdown*.

In the event that any impaired class of claims or interests does not accept a plan, a debtor nevertheless may move for confirmation of the plan.  A plan may be confirmed, even if it is not accepted by all impaired classes, if the plan has been accepted by at least one impaired class of claims, determined without including any acceptance of the plan by any insider holding a claim in that class, and the plan meets the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code requires that a court find that a plan (a) "does not discriminate unfairly" and (b) is "fair and equitable," with respect to each non-accepting impaired class of claims or interests.  If an impaired class votes against confirmation, the Plan Proponent will seek confirmation of the Plan from the Bankruptcy Court by satisfying the "cramdown" requirements set forth in section 1129(b) of the Bankruptcy Code.  The Plan Proponent believes that such requirements are satisfied, as no holder of a Claim or Interest junior to those in the Impaired Classes is entitled to receive any property under the Plan.

The concept of "unfair discrimination" is not defined in the Bankruptcy Code, but has been suggested in recent case law to arise when a difference in a plan's treatment of two classes of equal priority results in a materially lower percentage recovery for the non-accepting class.  Based upon their understanding of existing case law, the Plan Proponent does not believe that the Plan unfairly discriminates against any Class of Claims.

The Bankruptcy Code provides a nonexclusive definition of the phrase "fair and equitable." To determine whether a plan is "fair and equitable," the Bankruptcy Code establishes "cramdown" tests for secured creditors, unsecured creditors, and equity holders, as follows:

Secured Creditors.  Either (i) each impaired secured creditor retains its liens securing its secured claim and receives on account of its secured claim deferred Cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

Unsecured Creditors.  Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amount of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

Interests.  Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the

interest or (ii) the holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

As discussed above, the Plan Proponent believes that the distributions provided under the Plan satisfy the absolute priority rule, where required.

**6.7**     *Feasibility*.

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the Plan).  Because the Plan proposes a liquidation of all of the Debtor's assets, for purposes of this test, the Plan Proponent has analyzed the ability of the Debtor to meet its obligations under the Plan.  Based on this analysis, the estate will have sufficient assets to accomplish its tasks under the Plan.  Therefore, the Plan Proponent believes that the liquidation pursuant to the Plan will meet the feasibility requirements of the Bankruptcy Code.

**6.8**     *Best Interests Test and Liquidation Analysis*.

Even if a plan is accepted by the holders of each class of claims and interests, the Bankruptcy Code requires the Bankruptcy Court to determine that such plan is in the best interests of all holders of claims or interests that are impaired by that plan and that have not accepted the plan.  The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a court to find either that all members of an impaired class of claims or interests have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

To calculate the probable distribution to holders of each impaired class of claims and interests if the debtor was liquidated under chapter 7, a court must first determine the aggregate dollar amount that would be generated from a debtor's assets if its chapter 11 cases were converted to cases under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the present value of the distributions from the proceeds of a liquidation of the debtor's unencumbered assets and properties, after subtracting the amounts attributable to the costs, expenses, and administrative claims associated with a chapter 7 liquidation, must be compared with the value offered to such impaired classes under the plan.  If the hypothetical liquidation distribution to holders of claims or interests in any impaired class is greater than the distributions to be received by such parties under the plan, then such plan is not in the best interests of the holders of claims or interests in such impaired class.

The Plan Proponent, with the assistance of its advisors, has prepared a liquidation analysis that summarizes the best estimate of recoveries by holders of Claims and Interests if the Chapter 11 Case is converted to a case under chapter 7 on or after January 1, 2024 (the "Liquidation Analysis"), which is attached to the Plan as **Exhibit A**.

Because the Debtor's primary asset will be sold pursuant to the terms of this Plan, the Plan Proponent expects that the value of any Distributions if the Chapter 11 Case was to be converted to a case under chapter 7 of the Bankruptcy Code would be less than the value of Distributions

under the Plan.  This is because conversion of the Chapter 11 Case to a chapter 7 case would require the appointment of a chapter 7 trustee and, in turn, such chapter 7 trustee's likely retention of new professionals.  The "learning curve" that the chapter 7 trustee and new professionals would be faced with comes with potential additional costs to the Estate and with a delay compared to the time of Distributions under the Plan.  The Plan Proponent believes that a liquidation under chapter 7 would not provide for a timely distribution and that such distributions would likely be smaller because a chapter 7 trustee and his/her professionals would have to expend significant time and resources familiarizing themselves with the history of the Debtor and the Disputed Clams prior to pursuing any objections to such claims.

The costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a trustee in the form of statutory fees relating to the Distributions of the already monetized assets that are made to creditors, as well as the costs of counsel and other professionals retained by the trustee.  The Plan Proponent believes that such amount would exceed the amount of expenses that would be incurred in implementing the Plan.  And if the Property did not sell for more than the Secured Lender's claim, unsecured creditors would not receive a distribution in a chapter 7 case.   Conversion also would likely delay the liquidation process and ultimate distribution of the Assets, and would also mean the establishment of a new claims bar date, which could result in new Claims being asserted against the Debtor, thereby diluting the recoveries of, among others, other holders of Allowed General Unsecured Claims.

The Liquidation Analysis contains a number of estimates and assumptions that, although developed and considered reasonable by the Plan Proponent, are inherently subject to significant economic and competitive uncertainties and contingencies.  The Liquidation Analysis also is based on assumptions with regard to liquidation decisions that are subject to change and significant economic and competitive uncertainties and contingencies.   Accordingly, the values reflected might not be realized.  The chapter 7 liquidation period is assumed to last 12 months following the appointment of a chapter 7 trustee, allowing for, among other things, a due diligence and investigation period, the claims resolution process, including the litigation of certain Disputed Claims, the wind-down of the Debtor's estate, and the finalization of tax affairs.  All holders of Claims that are entitled to vote to accept or reject the Plan are urged to examine carefully all of the assumptions on which the Liquidation Analysis is based in connection with their evaluation of the Plan.

Accordingly, the Plan Proponent believes that holders of Allowed Claims would receive less than anticipated under the Plan if the Chapter 11 Case were converted to a chapter 7 case, and therefore, the classification and treatment of Claims and Interests in the Plan complies with section 1129(a)(7) of the Bankruptcy Code.

**6.9**     ***Eligibility to Vote on the Plan*** .

Unless otherwise ordered by the Bankruptcy Court, only holders of Allowed Claims in the Voting Classes may vote on the Plan.  Further, subject to the tabulation procedures that were approved by the Conditional Approval and Procedures Order, in order to vote on the Plan, you must hold an *Allowed* Claim in the Voting Classes, or be the holder of a Claim that has been temporarily Allowed for voting purposes only pursuant to the approved tabulation procedures or under Bankruptcy Rule 3018(a).

**6.10**     *Solicitation Package*.

All holders of Allowed Claims in the Voting Classes will receive a Solicitation Package. The Solicitation Packages will contain: (i) the Plan; (ii) the Order approving the Disclosure Statement and setting confirmation procedures; (iii) notice of the Confirmation Hearing; (iv) a form of Ballot, including voting instructions and a pre-addressed, postage prepaid return envelope; and (v) such other materials as the Court may direct or approve or that the Plan Proponent deems appropriate.

**6.11**     *Voting Procedures and Voting Deadline*.

The Voting Record Date for determining which holders of Claims in the Voting Classes may vote on the Plan is March 28, 2024.

In order for your Ballot to count, you must (1) complete, date, and properly execute the Ballot and (2) properly deliver the Ballot to counsel to the Plan Proponent by mailing the Ballot to: Ann E. Pille, Esq., Reed Smith LLP, 10 S. Wacker Drive, Suite 4000, Chicago, IL 60606.

Ballots must be submitted to Reed Smith LLP on or before the Voting Deadline, which is **May 3, 2024 at 4:00 p.m. (prevailing Central Time)**. Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, you may not change your vote once a Ballot is submitted. Subject to the tabulation procedures approved by the Conditional Approval and Procedures Order, any Ballot that is timely and properly submitted electronically or received physically will be counted and will be deemed to be cast as an acceptance, rejection or abstention, as the case may be, of the Plan.

**IF YOU ARE ENTITLED TO VOTE ON THE PLAN, YOU ARE URGED TO COMPLETE, DATE, SIGN, AND PROMPTLY MAIL THE BALLOT YOU RECEIVE. PLEASE BE SURE TO COMPLETE ALL BALLOT ITEMS PROPERLY AND LEGIBLY. IF YOU ARE A HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN AND YOU DID NOT RECEIVE A BALLOT, YOU RECEIVED A DAMAGED BALLOT, OR YOU LOST YOUR BALLOT, OR IF YOU HAVE ANY QUESTIONS CONCERNING THE PLAN OR PROCEDURES FOR VOTING ON THE PLAN, PLEASE CONTACT THE BALLOTING AGENT. THE BALLOTING AGENT IS NOT AUTHORIZED TO, AND WILL NOT, PROVIDE LEGAL ADVICE.**

**6.12**     *Acceptance of the Plan*.

If you are a holder of a Claim in one of the Voting Classes, your acceptance of the Plan is important. In order for the Plan to be accepted by an Impaired Class of Claims, a majority in number (*i.e.*, more than half) and two-thirds in dollar amount of the Claims voting (of each Impaired Class of Claims) must vote to accept the Plan. At least one Impaired Class of Creditors, excluding the votes of insiders, must actually vote to accept the Plan. The Plan Proponent urges that you vote to accept the Plan.

**6.13**     *Plan Injunction, Exculpation, and Releases.*

The Plan contains injunction, exculpation, and release provisions as follows:

**INJUNCTION**

Section 10.2(a) of the Plan provides that on the Effective Date, all Persons who have held, hold or may hold Claims against or Equity Interests in the Debtor shall, with respect to any such Claims or Equity Interests, be permanently enjoined from (i) taking any action against, or interfering in any respect with, the property being distributed in accordance with the Plan or the Distribution being effectuated through the Plan (other than actions to enforce any rights or obligations under the Plan); (ii) asserting any right of setoff or recoupment of any kind, directly or indirectly, against any obligation due the Estate, except as contemplated or allowed by the Plan; and (iii) prosecuting or otherwise asserting any right, claim or cause of action specifically exculpated, released or enjoined pursuant to the Plan.

**EXCULPATION**

Under Section 10.2(e) of the Plan, the Debtor, the Secured Lender, all of their respective professionals, consultants, representatives, employees, officers, directors, managers and agents, and their successors and assigns, shall neither have, nor incur, any liability to any person or entity for any postpetition act taken or omitted to be taken in connection with, or related to formulating, negotiating, soliciting, preparing, disseminating, implementing, confirming, or effecting the consummation of the Plan, including but not limited to the marketing of and sales process relating to the Sale, the Disclosure Statement, any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan or any other prepetition or postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtor; provided that the foregoing "Exculpation" shall have no effect on the liability of any of the parties that results from any such act or omission that is determined in a Final Order to have constituted gross negligence or willful misconduct or limit the liability of any professional to its client pursuant to DR 6-102 of the Code of Professional Responsibility; provided, further, that each of the foregoing Entities shall be entitled to rely upon the advice of counsel concerning his, her, or its duties pursuant to, or in connection with, the Plan or any other related document, instrument, or agreement. Notwithstanding the foregoing, nothing set forth above shall operate to limit or excuse compliance by any Entity with any of their respective obligations under the Plan or otherwise or to modify the effect or consequence of any such failure to comply with such obligations.

**RELEASES**

Section 10.2(b) of the Plan provides that as of the Effective Date, all holders of Claims and Interests shall be permanently enjoined from commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other form) against the Debtor based on any claim or cause of action against or concerning the Debtor, the Estate or the Property which arose prior to the Effective Date.

Section 10.2(c) of the Plan provides that In consideration for the agreements of the Secured Lender contained in this Plan, the Debtor, its Estate and any person claiming through or on behalf of the Debtor or its Estate, their successors and assigns shall be

**permanently enjoined from and after the Effective Date from commencing, conducting or continuing in any manner, directly or indirectly, any suit, action or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other form) against Secured Lender based on any claim or cause of action against the Secured Lender which arose prior to the Effective Date.**

**Notwithstanding the foregoing, the releases in the Plan shall not operate to waive or release: (y) any Causes of Action against any person or entity that is not a Released Party; or (z) the right of any party to enforce the Plan and the contracts, instruments, releases, and other agreements or documents delivered under or in connection with the Plan or assumed pursuant to the Plan or assumed pursuant to a Final Order**

## SECTION 7
## CERTAIN RISK FACTORS, TAX CONSEQUENCES, AND OTHER DISCLOSURES

**7.1**   *Certain Risk Factors to be Considered*.

THE PLAN AND ITS IMPLEMENTATION ARE SUBJECT TO CERTAIN RISKS, INCLUDING, BUT NOT LIMITED TO, THE RISK FACTORS SET FORTH BELOW. HOLDERS OF CLAIMS WHO ARE ENTITLED TO VOTE ON THE PLAN SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS, AS WELL AS THE OTHER INFORMATION SET FORTH IN THE PLAN AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH OR REFERRED TO OR INCORPORATED BY REFERENCE HEREIN, BEFORE DECIDING WHETHER TO VOTE TO ACCEPT OR REJECT THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

<u>The Plan May Not Be Accepted</u>.

The Plan Proponent can make no assurances that the requisite acceptances of the Plan will be received, and the Plan Proponent may need to obtain acceptances of an alternative plan of liquidation, or otherwise, that may not have the support of the creditors and/or may be required to liquidate the Estate under chapter 7 of the Bankruptcy Code.  There can be no assurance that the terms of any such alternative restructuring arrangement or plan would be similar to or as favorable to creditors as those proposed in the Plan.

<u>The Plan May Not Be Confirmed</u>.

Even if the Plan Proponent receives the requisite acceptances, there is no assurance that the Bankruptcy Court, which may exercise substantial discretion as a court of equity, will confirm the Plan.  Even if the Bankruptcy Court determined that the Plan and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it finds that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan.  While, as more

fully set forth section 6 hereof, the Plan Proponent believes that the Plan complies with or will comply with all such requirements, there can be no guarantee that the Bankruptcy Court will agree.

Moreover, there can be no assurance that modifications to the Plan will not be required for Confirmation or that such modifications would not necessitate the re-solicitation of votes. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of liquidation.

If the Plan is not confirmed, the Plan will need to be revised and it is unclear whether a chapter 11 liquidation of the Debtor's assets could be implemented and what distribution the holders of Allowed Claims would receive. If an alternative could not be agreed to, it is possible that the Debtor would have to liquidate its assets in chapter 7, in which case it is likely that the holders of Allowed Claims would receive substantially less favorable treatment than they would receive under the Plan. There can be no assurance that the terms of any such alternative would be similar to or as favorable to the Debtor's creditors as those proposed in the Plan.

<u>Distributions to Holders of Allowed Claims Under the Plan May be Inconsistent with Projections.</u>

Projected Distributions are based upon good faith estimates of the total amount of Claims ultimately Allowed and the funds available for Distribution. There can be no assurance that the estimated Claim amounts set forth in the Plan are correct. These estimated amounts are based on certain assumptions with respect to a variety of factors. Both the actual amount of Allowed Claims in a particular Class and the funds available for distribution to such Class may differ from the Plan Proponent's estimates. If the total amount of Allowed Claims in a Class is higher than the Plan Proponent's estimates, or the funds available for Distribution to such Class are lower than the Plan Proponent's estimates, the percentage recovery to holders of Allowed Claims in such Class will be less than projected.

<u>Objections to Classification of Claims.</u>

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. As is described in greater detail in section 6.4 of this Disclosure Statement, the Plan Proponent believes that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. Nevertheless, there can be no assurance the Bankruptcy Court will reach the same conclusion.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponent would seek to (i) modify the Plan to provide for whatever classification might be required for Confirmation and (ii) use the acceptances received from any holder of Claims pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such holder ultimately is deemed to be a member. Any such reclassification of Claims, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such holder was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan. There can be no assurance that the Court, after finding that a classification

was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification. Except to the extent that modification of classification in the Plan requires re-solicitation, the Plan Proponent will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Court that acceptance of the Plan by any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such holder, regardless of the Class as to which such holder is ultimately deemed to be a member. The Plan Proponent believes that under the Bankruptcy Rules, they would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim or Interest of any holder.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim or Interest of a particular Class unless the holder of a particular Claim or Interest agrees to a less favorable treatment of its Claim or Interest. The Plan Proponent believes that the Plan complies with the requirement of equal treatment. To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan. Issues or disputes relating to classification and/or treatment could result in a delay in the confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### Failure to Consummate the Plan.

Although the Plan Proponent believes that the Effective Date will occur, there can be no assurance as to such timing, or as to whether the Effective Date will, in fact, occur.

### Reductions to Estimated Creditor Recoveries.

The Allowed amount of Claims in any Class could be greater than projected, which, in turn, could cause the amount of distributions to creditors in such Class to be reduced substantially.

## 7.2    *Certain U.S. Federal Income Tax Consequences*.

The following discussion is a summary of certain material U.S. federal income tax consequences of the Plan to the Debtor and to certain holders (which solely for purposes of this discussion means the beneficial owner for U.S. federal income tax purposes) of Claims. The following summary does not address the U.S. federal income tax consequences to holders of Claims or Interests not entitled to vote on the Plan. This summary is based on the Internal Revenue Code, Treasury Regulations promulgated and proposed thereunder, judicial decisions, and published administrative rules and pronouncements of the IRS, all as in effect on the date hereof and all of which are subject to change or differing interpretations, possibly with retroactive effect. No legal opinions have been requested or obtained from counsel with respect to any of the tax aspects of the Plan and no rulings have been or will be requested from the IRS with respect to the any of the issues discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This discussion does not purport to address all aspects of U.S. federal income taxation that may be relevant to the Debtor or to certain holders of Claims in light of their individual circumstances, nor does the discussion deal with tax issues with respect to holders of Claims or

Interests subject to special treatment under the U.S. federal income tax laws (including, for example, insurance companies; banks or other financial institutions; brokers, dealers, or traders in securities; real estate investment trusts; governmental authorities or agencies; tax-exempt organizations; retirement plans; individual retirement or other tax-deferred accounts; certain expatriates or former long-term residents of the United States; small business investment companies; regulated investment companies; S corporations, partnerships, or other pass-through entities for U.S. federal income tax purposes and their owners; persons whose functional currency is not the U.S. dollar; persons who use a mark-to-market method of accounting; persons required to report income on an applicable financial statement; persons holding Claims or Interests as part of a straddle, hedge, constructive sale, conversion transaction, or other integrated transaction; and persons who are not U.S. Holders (as defined below)). Furthermore, this discussion assumes that a holder of a Claim holds such claim as a "capital asset" within the meaning of section 1221 of the Internal Revenue Code (generally property held for investment). This discussion does not address any U.S. federal non-income (including estate or gift), state, local, or foreign taxation, alternative minimum tax, or the Medicare tax on certain net investment income.

If a partnership (or other entity or arrangement classified as a partnership for U.S. federal income tax purposes) is a holder of Claims or Interests, the U.S. federal income tax treatment of a partner in the partnership will generally depend on the status of the partner and the activities of the partnership. A holder of a Claim or Interest that is a partnership and the partners in such partnership should consult their tax advisors with regard to the U.S. federal income tax consequences of the Plan.

**THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

<u>Tax Consequences for U.S. Holders of Claims in the Voting Classes</u>.

Generally, a U.S. Holder of a Voting Class should recognize gain or loss equal to the difference between the amount of Cash received by such U.S. Holder in respect of such Claim (other than any Cash received in respect of accrued and unpaid interest, which will be taxed as set forth in the next paragraph below) and such U.S. Holder's adjusted tax basis in such Claim. The character of any such gain or loss will depend on a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in the U.S. Holder's hands, whether the Claim was purchased at a discount, whether the Claim constitute a capital asset in the hands of the U.S. Holder, the U.S. Holder's holding period of the Claim, and the extent to which the holder previously claimed a bad debt deduction or deduction for the worthlessness of all or a portion of the Claim. Subject to the market discount rules discussed below, if the Claim is a capital asset in the holder's hands, any gain or loss realized will generally be characterized as capital gain or loss and will constitute long-term capital gain or loss if the holder has held such Claim for more than one (1) year. Under current U.S. federal income tax law, non-corporate U.S. may be eligible for reduced rates of taxation. The deductibility of capital losses is subject to limitations.

To the extent any amount of Cash received by a U.S. Holder of a Claim in a Voting Class is attributable to accrued but unpaid interest in respect of such Claim, the receipt of such Cash will be taxable to such U.S. Holder as ordinary income to the extent not previously included in income by such U.S. Holder.  Conversely, a U.S. Holder who previously included in its income accrued but unpaid interest attributable to its Claim in a Voting Class may be able to recognize a deductible loss to the extent that such accrued but unpaid interest is not paid in full.

Under the "market discount" provisions of the Internal Revenue Code, some or all of any gain realized by a U.S. Holder its Claim in a Voting Class may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim.  In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if the U.S. Holder's initial tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest," or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price, in each case, by at least a de minimis amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).  Any gain recognized by a U.S. Holder on the taxable disposition of a Claim that was acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Claim was considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued**).**

<u>Information Reporting and Withholding.</u>

In connection with the Plan, the Debtor will comply with all applicable withholding and information reporting requirements imposed by U.S. federal, state, local, and foreign taxing authorities, and all Distributions under the Plan will be subject to those withholding and information reporting requirements.  Holders of Claims may be required to provide certain tax information as a condition to receiving Distributions pursuant to the Plan.

In general, information reporting requirements may apply to Distributions pursuant to the Plan.  Additionally, under the backup withholding rules, a holder may be subject to backup withholding (currently at a rate of 24%) with respect to Distributions made pursuant to the Plan, unless a U.S. Holder provides the applicable withholding agent with a taxpayer identification number, certified under penalties of perjury, as well as certain other information, or otherwise establish an exemption from backup withholding.  Backup withholding is not an additional tax.  Any amounts withheld under the backup withholding rules will be allowed as a credit against a U.S. Holder's U.S. federal income tax liability, if any, and may entitle a U.S. Holder to a refund, provided the required information is timely furnished to the IRS.

In addition, from an information reporting perspective, Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds.  Holders of Claims or Interests are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holder's tax returns.

THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE
COMPLEX.  THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF
U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR
HOLDER OF A CLAIM OR INTEREST IN LIGHT OF SUCH HOLDER'S
CIRCUMSTANCES.  EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO
CONSULT WITH SUCH HOLDER'S TAX ADVISORS CONCERNING THE U.S.
FEDERAL, STATE, LOCAL, FOREIGN, AND OTHER TAX CONSEQUENCES OF THE
PLAN.

**7.3      *Releases, Exculpations, and Injunctions*.**

Section 10.2 of the Plan contains certain releases, exculpations, and injunction language.
Parties are urged to read these provisions carefully to understand how Confirmation and
consummation of the Plan will affect any Claim, interest, right, or action with regard to the Plan
Proponent and certain third parties.

THE PLAN SHALL BIND ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR
TO THE FULLEST EXTENT AUTHORIZED OR PROVIDED UNDER THE
APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND ALL OTHER
APPLICABLE LAW.

**7.4      *Alternatives to the Plan*.**

If the requisite acceptances are not received or the Plan is not confirmed and consummated,
the theoretical alternatives to the Plan would be (a) formulation of one or more alternative chapter
11 plans, (b) conversion of the Chapter 11 Case to cases under chapter 7 of the Bankruptcy Code,
or (c) dismissal of the Chapter 11 Case.  As discussed below, the Plan Proponent does not believe
that any of these alternatives, even if viable, would afford holders of Claims or Interests a greater
recovery than what is provided by the Plan.

If the Plan is not confirmed, then other parties-in-interest could attempt to formulate a
different plan.  At this time, the Plan Proponent does not believe that there are viable alternative
plans available to the Debtor.  The Property 363 Motion is the best option to maximize recovery
for the Debtor's estate.  Accordingly, the Plan Proponent believes that the Plan provides the
greatest possible value to all stakeholders under the circumstances and has the greatest chance to
be confirmed and consummated.

If the Plan is not confirmed, the Chapter 11 Case may be converted to cases under chapter
7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate
and distribute the Debtor's assets in accordance with the priorities established by the Bankruptcy
Code.  As discussed herein and indicated in the Liquidation Analysis, the Plan Proponent believes
that the Plan provides a better outcome for holders of Claims than a chapter 7 liquidation would
provide.

If the Plan is not confirmed, the Chapter 11 Case also could be dismissed.  Among other
effects, dismissal would result in the termination of the automatic stay.  Upon dismissal, the
Secured Lender would continue prosecuting its foreclosure action.  Accordingly, it is unlikely that
dismissal would result in a ratable distribution of the Debtor's assets among creditors as provided

in the Plan.  Thus, the vast majority of creditors could expect to receive less in the dismissal scenario than they would receive under the Plan.

## SECTION 8
## VOTING IN FAVOR OF THE PLAN

**8.1**      *Plan Support*.

     *The Plan Proponent believes that the Plan and Disclosure Statement provides the best method of maximizing the recoveries for the holders of Claims against the Debtor.  Therefore, the Plan Proponent recommends that all creditors who are entitled to vote should vote in favor of the Plan*.

DATED:      March 6, 2024